**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHRISTIE MADRIGAL,

       Plaintiff,

                                    Case No. 03-74817

v.                                 Hon. Gerald E. Rosen

CNA GROUP LIFE ASSURANCE
COMPANY,

       Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING CROSS-MOTIONS TO REVERSE OR AFFIRM**
**<u>ADMINISTRATOR'S TERMINATION OF DISABILITY BENEFITS</u>**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _September 27, 2006_____

PRESENT:  Honorable Gerald E. Rosen
                United States District Judge

## I. <u>INTRODUCTION</u>

In the present suit, Plaintiff Christie Madrigal challenges the decision of the

Defendant claims administrator, Continental Casualty Company,[1] to cease payment of

long-term disability benefits under a plan offered by Plaintiff's employer, MSX

---

[1]Although Plaintiff's complaint identifies Defendant as "CNA Group Life Assurance
Company," it appears from the relevant plan documents in the record that Continental Casualty
Company is the claims administrator, and Defendant has filed its submissions to the Court in this
name.

1

International.  This Court's subject matter jurisdiction over this case rests upon Plaintiff's claim for benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Presently before the Court are the parties' cross-motions to affirm or reverse Defendant's decision to terminate long-term disability benefits to Plaintiff.  The parties agree that the "arbitrary and capricious" standard governs this Court's review of the challenged determination.  Nonetheless, Plaintiff maintains that the decision here must be overturned even under this deferential standard of review, where Defendant allegedly (I) disregarded evidence of Plaintiff's physical disabilities in terminating her benefits; (ii) failed to give proper weight to the opinions of Plaintiff's treating physicians and to an award of Social Security benefits; (iii) failed to provide a reasoned basis for its decision; and (iv) erroneously invoked an inapplicable provision of the disability plan as the ground for terminating Plaintiff's benefits.

The parties' cross-motions now have been fully briefed on both sides and are ready for decision.  Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs," see Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan, following the guidelines set forth by the Sixth Circuit in Wilkins v.

2

Baptist Healthcare System, Inc., 150 F.3d 609, 619 (6th Cir. 1998).[2]  This Opinion and

Order sets forth the Court's findings of fact and conclusions of law.  To the extent that

any findings of fact constitute conclusions of law, they are adopted as such.  To the extent

that any conclusions of law constitute findings of fact, they are so adopted.

## II.  <u>FINDINGS OF FACT</u>

Although the administrative record in this case is fairly sizable, it is not necessary

to recount this record at length here.  Rather, as discussed below, a brief summary of this

record is sufficient to frame the dispositive issues presented in the parties' cross-motions.

Plaintiff Christie Madrigal was employed by MSX International as an

administrative assistant and project analyst.  As an employee, Plaintiff was eligible for

coverage under a long-term disability benefit plan (the "Plan") offered by her employer.

Under this Plan, benefits are paid in accordance with the terms of a group disability

insurance policy issued by Defendant Continental Casualty Company, and claims for

benefits likewise are administered by Defendant.

**A.**     **The Pertinent Plan Provisions**

The Plan defines a "disability" as follows:

> *"Disability"* means that during the *Elimination Period* and the
> following 24 months, *Injury* or *Sickness* causes physical or mental
> impairment to such a degree of severity that *You* are:

---

[2]Specifically, <u>Wilkins</u> holds that neither summary judgment nor a bench trial provides an appropriate procedural basis for resolving ERISA actions to recover benefits.  Rather, the Sixth Circuit suggested that district courts generally should review challenged benefit denials "based solely upon the administrative record, and [should] render findings of fact and conclusions of law accordingly."  <u>Wilkins</u>, 150 F.3d at 619.

      1.  continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation;* and

      2.  not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

      After the *Monthly Benefit* has been payable for 24 months, *"Disability"* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

      1.  continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and

      2.  not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(Plan at 10-11, AR at 13-14.)[3]

In a subsequent list of exclusions and limitations, the Plan provides that it "does not cover any loss caused by, contributed to, or resulting from . . . *Disability* beyond 24 months after the *Elimination Period* if it is due to a *Mental Disorder* of any type."  (Id. at 15, AR at 18.)  The Plan, in turn, defines a "Mental Disorder" as "a disorder found in the current diagnostic standards manual of the American Psychiatric Association."  (Id. at 22, AR at 25.)

Under the plan, Defendant was granted the "discretionary authority to determine [a claimant's] eligibility for benefits and to interpret the terms and provisions of the policy."  (Id. at 8, AR at 11.)  The Plan later reaffirms that "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine

---

    [3]The italicized words and phrases are listed and defined in an accompanying glossary or within the provisions of the Plan itself.

4

eligibility for and entitlement to benefits in accordance with the Plan." (Id. at 23, AR at 26.)

## B.    The Pertinent Medical Record

During the period of relevance to this case, 2000 through 2002, Plaintiff was seen by several medical professionals.  On June 12, 2000, she was seen by Dr. Luis Fanego, and she reported increased stress as a result of management restructuring and reorganization at her workplace.  (AR at 351.)  Plaintiff stated that she was "almost having anxiety attacks," and that she was "already on SSRI therapy, as well as Valium." (Id.)  Dr. Fanego diagnosed Plaintiff as suffering from a variety of conditions, including (I) dyspnea, which the doctor opined was "[l]ikely stress related," (ii) asthma/COPD, (iii) hyperlipidemia, (iv) chronic neck pain, (v) obesity, (vi) myoclonus, (vii) fibromyalgia, (viii) gastritis, (ix) borderline hypertension, (x) right knee pain, and (xi) possible panic disorder.  (Id. at 351-52.)  The doctor further opined that "[w]e have encouraged her to try to go back to work," but that "[i]f she is unable to do so, she is to come back in and we might keep her off for a short period of time on a stress-type leave."  (Id. at 351.)

The record also reflects other visits by Plaintiff to Dr. Fanego over the next several months.  The doctor's notes from Plaintiff's June 29 and July 17, 2000 visits include diagnoses of major depression and several other conditions.  (See id. at 349, 353-54.)  In an assessment prepared in early October of 2000 in response to an inquiry from one of Defendant's nurse case managers, Dr. Fanego opined that Plaintiff suffered from "a multitude of chronic physical . . . problems," but that "[c]urrently, her emotional issues

5

seem to be limiting her prompt recovery more than her other multiple medical problems." (<u>Id.</u> at 314.)

Plaintiff also was seen by Dr. Mamoun Dabbagh of Metro Shores Counseling, as well as one or more therapists at this facility.  On July 12, 2000, Dr. Dabbagh reported that Plaintiff "seems to be overwhelmed," and that "[t]here is more depression, more irritability, crying spells, and hopelessness and helplessness feeling." (<u>Id.</u> at 343.)  The doctor concurred in the decision of Plaintiff's primary care physician to increase her daily dose of Valium, and he also prescribed Effexor, Zoloft, and Ambien.  (<u>See</u> <u>id.</u>)  On August 2, 2000, Dr. Dabbagh opined that Plaintiff was "[s]till doing marginal," and that she was "still feeling anxious and nervous."  (<u>Id.</u> at 327.)  On August 28, 2000, Dr. Dabbagh completed an assessment form in support of Plaintiff's claim for benefits, in which he diagnosed Plaintiff as suffering from major depression and reported severe deficits in attention/concentration, memory, decision-making, problem solving, ability to sustain effort, ability to relate to others, and ability to complete detailed work.  (<u>See</u> <u>id.</u> at 321.)

Dr. Dabbagh continued to treat Plaintiff throughout much or all of the relevant period.  On April 18, 2001, for example, he reported that Plaintiff was still "[d]oing marginal" and that she appeared "quite agitated, irritable, still having a lot of chronic pain, a lot of anxiety about her husband having surgery and a lot of difficulty with her job because of her disability paperwork," and he increased her daily dosage of Valium.  (<u>Id.</u> at 184.)  On August 15, 2001, the doctor opined that Plaintiff was "[d]oing quite

6

marginal," with increased "anxiety, irritability, and mood swinging." (<u>Id.</u> at 168.)  Dr.

Dabbagh also completed a functional assessment form on March 6, 2002, opining that

Plaintiff was unable at that time to perform her job as a project analyst.  (<u>See id.</u> at 146.)

In late 2000 and early 2001, Plaintiff was treated for a back condition.  A

November 8, 2000 MRI revealed one or more herniated disks.  On November 22, 2000,

Plaintiff was seen by an orthopedist, Dr. Glen Minster, who recommended "provocative

discography to evaluate the lumbar disks." (<u>Id.</u> at 300.)  Plaintiff underwent this

procedure on December 14, 2000, and then returned to Dr. Minster, who diagnosed a

herniated disk and recommended a "posterior interbody fusion procedure." (<u>Id.</u> at 297.)

Plaintiff elected to undergo this procedure in January of 2001, and she reported during a

March 20, 2001 visit to Dr. Minster that she was "doing much better since her surgery."

(<u>Id.</u> at 278.)  On April 20, 2001, however, Dr. Minster wrote a note stating that Plaintiff

was to "continue off work at this time secondary to recovery from a recent lumbar fusion

surgery." (<u>Id.</u> at 267.)

On April 18, 2001, Plaintiff was seen by a rheumatologist, Dr. Ali Dagher.  During

this visit, Plaintiff reported that "her back [wa]s better" following her recent surgery, but

that she was "very depressed, stressed, and anxious." (<u>Id.</u> at 269.)  Plaintiff

"complain[ed] of increasing pain in the feet," "muscle cramping in the leg," and "pain in

the head, shoulders, and neck as well as the ribcage with shooting and burning pain in the

upper extremities." (<u>Id.</u>)  Dr. Dagher's examination revealed symptoms of osteoarthritis

and fibromyalgia, and also "problems with depression, anxiety, and tension as well as

7

panic attacks," and the doctor noted that Plaintiff was "due to see her psychiatrist today." (Id.)  Dr. Dagher recommended a one-month course of Arthrotec, after which Plaintiff could "go back on Celebrex," and also recommended that Plaintiff resume taking a medication, Neurontin, that she had recently been asked to discontinue.  (Id.)

Plaintiff also was seen by Dr. Michael Baghdoian of Orthopedic Associates, P.C. for problems with her knees.  In an August 2, 2002 examination, Dr. Baghdoian noted that Plaintiff had "extensive damage" in her left knee as confirmed by an MRI, and he diagnosed her as suffering from "[a]dvanced degenerative osteoarthralgia of the left knee," as well as bronchial asthma, chronic depression syndrome, advanced fibromyalgia, low back syndrome, and chronic pain syndrome.  (Id. at 118-19.)  The doctor recommended a total knee arthroplasty, opining that "this will probably take a lot of her discomfort away," but acknowledging that "she has a lot of medical problems" and that the recommended procedure "will only answer part of her problems."  (Id. at 119.)

Plaintiff underwent this recommended procedure in September of 2002.  In early October of 2002, Dr. Baghdoian reported that the surgical site was clean, and that x-rays "reveal[ed] a well seated prosthetic component system of the left knee."  (Id. at 128.)  The doctor recommended that Plaintiff begin a program of physical therapy.  (See id.)

In a follow-up visit in February of 2003, Dr. Baghdoian opined that Plaintiff "has done well" following her knee surgery, but that she suffered from "chronic venous insufficiency" that had contributed to continued swelling and discomfort.  (Id. at 57.)  The doctor found that Plaintiff had "good range of motion" and believed that "she [wa]s going

8

to resolve," but noted that she continued to "use a single point cane for supportive

ambulation." (Id.) Dr. Baghdoian also reported that Plaintiff was "pursuing full

disability" and he "concur[red] that this will be her status," opining that she was unable to

"stand, walk or prolong sit for any length of time." (Id. at 58.) He further noted that

Plaintiff had "a myriad of medications on board for a number of problems including

fibromyalgia and mixed anxiety with panic attack syndrome, hypertension,

hypercholesterolemia, chronic obstructive pulmonary disease with bronchial asthma,

chronic pain syndrome, GERD syndrome and generalized osteoarthritis," and he opined

that "[t]his certainly will fall in the category of total permanent disability." (Id.)

Dr. Baghdoian saw Plaintiff again in April of 2003. She had complained of right

knee pain in a prior visit, (see id. at 57), and she now reported that this pain had worsened

and that she had experienced other symptoms relating to this condition, (see id. at 55).

The doctor recommended an arthroscopic procedure, and concluded that her prognosis

was "[f]air to favorable." (Id. at 56.)

Plaintiff also was seen by an internal medicine consultant, Dr. Samatha

Chandupatla, shortly after her knee surgery in September of 2002. Dr. Chandupatla noted

that Plaintiff was "very lethargic" due to her recent surgery and pain medications. (Id. at

121.) Following an examination, the doctor reported that Plaintiff was "[s]tatus post left

total knee arthroplasty," that she had histories of asthma, fibromyalgia, hypertension,

gastroesophageal reflux disease, urinary frequency, and panic attacks, that she suffered

from depression, and that she had a "[q]uestionable history of hypolipoproteinemia." (Id.

9

at 122-23.)  Dr. Chandupatla noted that Plaintiff was taking a variety of medications for

these conditions, recommended that she continue most of these medications along with

one or two others, and stated that "[w]e will continue to monitor this patient."  (Id. at 122-

23.)

 Finally, the medical record includes a November 7, 2002 letter from Dr. Mini

Goddard, a physical medicine and rehabilitation specialist, who indicated that she had

been seeing Plaintiff at her clinic since March 7, 2002 "for the diagnosis of fibromyalgia

syndrome and other multiple diagnoses, such as right-sided cervical radiculopathy (C6-

C7), left knee pain s/p surgery for ACL tear, meniscus tears, and degenerative joint

disease, chronic pain syndrome, and depression related to all of the above diagnoses."

(Id. at 112.)  Dr. Goddard opined that Plaintiff was "definitely disabled from working due

to the above diagnoses," and that, "[i]n particular, she has total and permanent disability

secondary to the fibromyalgia syndrome, which is the main diagnosis causing her chronic

pain syndrome accompanied by depression."  (Id.)

**C.     Plaintiff's Claim for Disability Benefits**

Plaintiff submitted an initial claim for short-term disability benefits on July 13, 2000, accompanied by a statement from her physician, Dr. Fanego, that she was suffering from "major depression." (Id. at 360.) Plaintiff stated that her last day of work was June 28, 2000. On July 26, 2000, Defendant notified Plaintiff that she would receive disability benefits through July 26, 2000, but that it was anticipated that she then would be able to return to work unless she provided further information from her physician regarding her "current diagnosis and functionality." (Id. at 358.) Upon receiving this additional information, however, Defendant extended Plaintiff's short-term disability benefits through August 30, 2000, (see id. at 340), and it appears that Plaintiff continued to receive these benefits through the latter part of 2000.

Effective December 26, 2000, Plaintiff began receiving long-term disability benefits. (See id. at 291.) On November 8, 2002, however, Defendant notified Plaintiff that these benefits would cease on December 25, 2002. (See id. at 130.) Specifically, Defendant's representative explained:

> The policy limits your disability benefits to a maximum period of twenty-four (24) months after the elimination period when your disability is due to a mental or emotional disorder. The medical information received indicates that your disability is the result of a mental or emotional disorder. Therefore, your benefit period will be limited to 24 months while you remain totally disabled according to the terms of the contract. Your mental nervous maximum period will end on 12/25/02.

(Id.) Plaintiff was advised of her right to appeal this determination in writing within 180 days, and to submit additional information in support of this appeal. (See id. at 130-31.)

11

Plaintiff responded to this letter on November 12, 2002, providing "medical information about my recent disability." (Id. at 116.) This response was accompanied primarily by records of Plaintiff's recent knee surgery and treatment by Dr. Baghdoian, as well as the November 7, 2002 letter from Dr. Goddard. At around the same time, Plaintiff prepared a list of her current medications, and reported that her medical conditions included stress, depression, panic attacks, severe fibromyalgia, osteoarthritis, and asthma. (See id. at 114.) She noted that she was being treated by an orthopedic surgeon, Dr. Baghdoian, a pain management specialist, Dr. Goddard, and a counselor from Dr. Dabbagh's facility, Vanessa Lewis, who she saw every two weeks. (See id.) Plaintiff also wrote a letter on November 26, 2002, in which she stated that she was appealing Defendant's decision to terminate her disability benefits, and she directed Defendant's attention to the medical records reflecting her recent knee surgery and her treatment for fibromyalgia and chronic pain. (See id. at 110.)

On January 8, 2003, Defendant's appeals committee notified Plaintiff that it had affirmed the decision to terminate her long-term disability benefits. This letter stated:

> At the onset of your claim, through medical evaluation, it was concluded that your loss commencing June 29, 2000 was covered under the mental/nervous portion of your long-term disability policy issued through your employer, MSX International. Your physical conditions were also considered during the review of your claim. While we acknowledge your condition concerning your back problem and resultant surgery for a lumbar fusion, this condition did not support a continuous physical impairment that would preclude you from performing your occupation and associated tasks beyond March 20, 2001. It is also acknowledged that you were treating with Dr. Dagher at that time for symptoms of osteoarthritis and fibromyalgia. While you received treatments for these conditions, there

12

was no medical evidence or physical findings which would preclude you from working with these conditions with reasonable amounts of sitting, standing and walking within the confines of an office environment.

* * * *

Further explained to you in [Defendant's] letter of November 8th were the exclusions of the policy which states in part:

"This policy does not cover any loss caused by or resulting from:

(2) Disability beyond 24 months after the Elimination Period if it is due to mental or emotional disorders of any type . . . .

As previously stated, where coverage was afforded under the mental or emotional disorder portion of the policy for the twenty-four (24) month period and payments were made for that time period, we find that the decision to terminate benefits was proper and correct.

(Id. at 87-88.)  Following this unfavorable disposition of her administrative appeal, Plaintiff now seeks judicial review of Defendant's decision to terminate her long-term disability benefits, contending that this decision was arbitrary and capricious.

### III.  CONCLUSIONS OF LAW

**A.**     **The Standards Governing  the Parties' Cross-Motions**

A participant or beneficiary of an ERISA qualified plan may bring suit in federal district court to recover benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  Courts review *de novo* a benefit determination challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies.  See Firestone Tire &

13

Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996).

Here, the parties agree that the "arbitrary and capricious" standard governs the Court's review, in light of the Plan provision that expressly confers upon Defendant the "discretionary authority to determine [a claimant's] eligibility for benefits and to interpret the terms and provisions of the policy." (Plan at 8, AR at 11.) This standard is the "least demanding form of judicial review," under which this Court must uphold a denial of benefits if it is "rational in light of the plan's provisions." Monks v. Keystone Powdered Metal Co., 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal quotation marks and citations omitted), aff'd, 2001 WL 493367 (6th Cir. May 3, 2001). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citations omitted), cert. denied, 495 U.S. 905 (1990). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." Marchetti v. Sun Life Assurance Co., 30 F. Supp.2d 1001, 1008 (M.D. Tenn. 1998).

In reviewing Defendant's decision, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator." Wilkins, 150 F.3d at 615, 619. The pertinent record, however, is not limited solely to the evidence before the administrator at the time of its

14

initial decision, but also includes materials produced during the administrative appeals

process.  Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991).

**B.    Defendant's Termination of Plaintiff's Long-Term Disability Benefits Was Not Arbitrary and Capricious.**

With the above standards in mind, the Court now turns to the benefit determination

at issue here.  As noted, Defendant terminated Plaintiff's long-term disability benefits

under a Plan provision that excludes coverage after an initial 24-month period for

disabilities due to a mental disorder.  In challenging this decision, Plaintiff principally

argues that Defendant improperly relied upon this exclusion, where the record includes

ample evidence of physical conditions that, in Plaintiff's view, qualify as disabling within

the meaning of the Plan.

Although the parties have not framed their respective arguments in precisely this

way, the Court views one particular issue as central to, and potentially dispositive of,

Plaintiff's various challenges in this case.  The exclusion invoked by Defendant provides

that the Plan "does not cover any loss caused by, contributed to, or resulting from . . .

*Disability* beyond 24 months after the *Elimination Period* if it is due to a *Mental Disorder*

of any type."  (Plan at 15, AR at 18.)  There seemingly is no dispute that Plaintiff's initial

receipt of disability benefits in the latter half of 2000 was due to a mental disorder —

indeed, the initial claim form submitted by Plaintiff in July of 2000 listed "major

depression" as her sole disabling condition.  (AR at 360.)  It is evident from the record,

moreover, that this mental condition did not abate prior to December 25, 2002, when

15

Defendant terminated Plaintiff's long-term disability benefits.  Throughout the 2000-2002 period, Plaintiff received treatment from mental health professionals, including her treating psychiatrist, Dr. Mamoun Dabbagh, and one or more therapists at Metro Shores Counseling, and the records of these treatments do not disclose any significant improvement in Plaintiff's mental health.  It presumably follows as a matter of simple logic, then, that the mental disorder that supported the initial award of disability benefits to Plaintiff remained a disabling condition throughout the 24-month period that she received long-term disability benefits.

Under these circumstances, the Court finds it appropriate to consider, as a threshold issue, whether Defendant acted arbitrarily and capriciously in applying the Plan's "mental disorder" exclusion, even in the face of medical evidence of other conditions that might independently have been disabling.  Defendant's reliance on this Plan provision survives review under this deferential standard so long as its interpretation of the exclusion is reasonable.  See Wells v. United States Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1248 (6th Cir. 1991).  The Court readily concludes that Defendant's determination satisfies this standard.

As noted, the Plan excludes coverage for "any loss caused by, contributed to, or resulting from . . . *Disability* beyond 24 months after the *Elimination Period* if it is due to a *Mental Disorder* of any type."  (Plan at 15, AR at 18.)  Plainly, this provision cuts off benefits after 24 months in cases where a claimant's disability is attributable solely to a mental condition.  Yet, this language may reasonably be construed as ***also*** limiting a

16

claimant to 24 months of benefits where his or her disability is attributable to **both** a mental **and** a physical condition, with either independently qualifying as a "disability" even in the absence of the other.  The exclusion in question, after all, is triggered if a loss is caused by or **contributed to** by a disability that stems from a mental disorder.  It is reasonable, then, to construe this provision as terminating benefits after 24 months where the continued entitlement to benefits rests, in whole or in part, upon a mentally disabling condition that spanned the entire 24-month period.

Viewed in this context, none of Plaintiff's various challenges to Defendant's decision is persuasive.  First, while Plaintiff asserts that Defendant failed to give proper weight to the opinions of her treating physicians,[4] the record reveals that Defendant did, in fact, rely on these physicians in determining that Plaintiff suffered from a disabling mental condition.  Specifically, Plaintiff's initial request for benefits was supported by the opinion of her primary care physician, Dr. Fanego, that she suffered from "major depression."  (AR at 360.)  In addition, the record is replete with the notes and observations of Plaintiff's treating psychiatrist, Dr. Dabbagh, and the therapists who saw Plaintiff during the relevant 2000-2002 period, reflecting the consistent and continuing opinions of these mental health professionals that Plaintiff suffered from depression, that her condition was marginal and showed little or no improvement, and that she regularly

---

[4]To the extent that Plaintiff relies upon the decision in <u>Darland v. Fortis Benefits Insurance Co.</u>, 317 F.3d 516, 532-33 (6th Cir. 2003), for the proposition that special weight must be accorded to the opinions of her treating physicians, the Court notes that this aspect of <u>Darland</u> is no longer good law in the wake of the Supreme Court's ruling in <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003).

suffered from such symptoms as anxiety, irritability, and mood swings.  On August 28, 2000, for example, Dr. Dabbagh diagnosed Plaintiff as suffering from major depression, and found that she was experiencing severe deficits in a number of mental functions bearing upon her ability to work.  (AR at 321.)  He confirmed this view in March of 2002, opining that Plaintiff was unable at that time to perform her job as a project analyst.  (See id. at 146.)  Defendant's finding of a disabling mental condition is fully consistent with the opinions of these treating mental health care professionals.

The additional opinions cited by Plaintiff are not to the contrary, but instead reflect, at best, a difference of views as to which of Plaintiff's mental and physical conditions was the primary cause of her inability to work.  Notably, while Plaintiff emphasizes the opinions of Drs. Baghdoian and Goddard that she was unable to work, both of these doctors listed "depression" or "anxiety" among the conditions from which Plaintiff was suffering.  (AR at 58, 112.)  Moreover, these two doctors specialized in orthopedics and physical medicine, respectively — thus, neither was treating Plaintiff for her mental conditions, and neither presumably would be qualified to opine as to the nature or severity of these conditions.[5]  Accordingly, Plaintiff has failed to identify any treating physician opinion that Defendant improperly disregarded in applying the "mental

---

[5]By the same token, the Court cannot accept Plaintiff's speculation that Dr. Dabbagh's assessment in March of 2002 that Plaintiff was unable to work was likely based on physical rather than mental impairments.  (See Plaintiff's Reply Br. at 2.)  Since Dr. Dabbagh is a psychiatrist who, so far as the record reveals, treated Plaintiff solely for mental health conditions, it seems far more probable that his assessment was based on his expertise and his experience of diagnosing and treating Plaintiff for these conditions.

disorder" exclusion to terminate Plaintiff's disability benefits.

Neither is Defendant's determination undermined by any purported inconsistency with Plaintiff's receipt of Social Security disability benefits.[6]  Simply stated, there is nothing inherently inconsistent between Defendant's termination of Plan benefits and an award of Social Security benefits.  Rather, "entitlement to Social Security benefits is measured by a uniform set of federal criteria" — including, notably, a treating physician rule that does not apply in the ERISA context — while "a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria." Whitaker, 404 F.3d at 949.  The present case amply illustrates this point:  the Plan mandates the termination of benefits after 24 months even if a claimant remains unable to work because of a disabling mental disorder, but this would not affect the claimant's entitlement to continued Social Security benefits.  Indeed, for all that can be discerned from the record, Plaintiff's receipt of Social Security benefits might have been entirely and exclusively grounded upon her mental disability.[7]  Such a Social Security

---

[6]Again, to the extent that Plaintiff relies on Darland, supra, 317 F.3d at 529-30, to suggest that Defendant's decision was arbitrary and capricious in light of its apparent inconsistency with the award of Social Security disability benefits, the Sixth Circuit subsequently has recognized that this aspect of Darland has been undermined, if not overruled, by the Supreme Court's Nord decision.  See, e.g., Calvert v. Firstar Finance, Inc., 409 F.3d 286, 293-95 (6th Cir. 2005); Whitaker v. Hartford Life & Accident Insurance Co., 404 F.3d 947, 949 (6th Cir. 2005).

[7]The Court has not been provided with copies of any decisions or other records that might shed light on the basis for the award of Social Security benefits.  Rather, Plaintiff cites only to two letters she received from Defendant that acknowledge her receipt of these benefits and seek reimbursement for certain alleged overpayments of Plan benefits in light of this additional source of recovery.  (AR at 203-06.)

19

determination would tend to support, rather than undermine, the decision at issue here. Accordingly, Plaintiff has failed to suggest how Defendant might have improperly discounted the significance of the award of Social Security benefits.

The Court also rejects Plaintiff's contention that Defendant disregarded evidence that she suffered from one or more physically disabling conditions, and that Defendant instead invoked a Plan provision that, in her view, applies only when a claimant's conditions are "solely mental and emotional."  (Plaintiff's Motion, Br. in Support at 2.) As explained, the exclusion applied by Defendant mandates the termination of disability benefits even if a claimant also suffers from a physical condition which, if unaccompanied by a mental condition, would independently support an award of disability benefits.  Under Defendant's reasonable interpretation of this provision, if additional physical conditions arise while a claimant remains under a mental disability, benefits will cease 24 months after the onset of the disabling mental condition, without regard to whether the physical conditions alone might have warranted a finding of disability and an award of benefits.

Thus, it simply is not accurate to characterize Defendant's actions in this case as denying a *subsequent* claim for benefits grounded on a physical condition by citing "an unrelated previous claim for mental and emotional conditions" for which benefits had been exhausted.  (Plaintiff's Motion, Br. in Support at 8.)  Under the Plan as construed by Defendant, Plaintiff's various efforts to obtain benefits were not "unrelated" claims, so long as each was grounded in a loss that was "contributed to" by an ongoing mental

20

disorder.  Because the records provided by Plaintiff's treating physicians consistently

reflected a disabling mental condition, Defendant did not act arbitrarily and capriciously

in limiting her to 24 months of benefits, even in the face of additional medical evidence

which, if viewed in isolation from the evidence of Plaintiff's mental conditions, might

have supported a separate and independent award of disability benefits.[8]

Finally, the Court cannot accept Plaintiff's contention that Defendant provided an

inadequate explanation of its decision.  Plaintiff complains, in essence, that Defendant

relied on claims representatives, case managers, and others who seemingly lacked the

qualifications to make medical judgments.  Yet, as explained, Defendant's decision is

fully consistent with the judgments of Plaintiff's treating physicians — this simply is not

a case in which a claims administrator substitutes its judgment for that of a claimant's

treating physician, or in which conclusions drawn on the basis of a file review are given

preference over the considered opinions of medical professionals who have actually

examined and treated the claimant.  The termination of benefits in this case rested upon a

Plan provision construed and applied in light of a generally uniform medical record,

rather than any arguably improper resolution of conflicts within the medical record.

---

[8]Having found that Defendant reasonably construed the Plan in this way, the Court need not inquire whether Defendant rationally could have concluded that the medical evidence of Plaintiff's physical conditions, if viewed separately, would not warrant an award of disability benefits.

21

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion to

reverse Defendant's ERISA determination and grant long-term disability benefits is

DENIED.  IT IS FURTHER ORDERED that Defendant's motion for judgment on the

merits is GRANTED.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  September 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 27, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager